2026 Tex. Bus. 53



THE BUSINESS COURT OF TEXAS
EIGHTH DIVISION

| | | |
|---|---|---|
| RIVERSIDE HOMEBUILDERS, LTD., | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | Cause No. 26-BC08B-0011 |
| FG ALEDO DEVELOPMENT, LLC, | § § § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

¶ 1.    Before the Court is Defendant FG Aledo Development, LLC's ("FG Aledo") Traditional Motion for Summary Judgment. FG Aledo seeks judgment on several independent grounds, including that the alleged contract upon which all of Riverside Homebuilders, Ltd.'s ("Riverside") claims depend is unenforceable under the statute of frauds.

¶ 2.    Having considered the parties' briefing, the summary-judgment evidence, the applicable law, and the arguments of counsel, the Court **GRANTS** the

Motion on that ground. Because the statute of frauds resolves the case, the Court does not reach FG Aledo's remaining arguments.

## INTRODUCTION

¶ 3.   Riverside claims the right to buy 181 residential lots in Morningstar Section 1-1, a subdivision in Parker County. FG Aledo developed that subdivision and owns the land. Riverside's claim hinges on a single document: the Morningstar Contract. The issue presented is whether that document creates an enforceable obligation to convey the lots.

¶ 4.   Much of the parties' briefing recounts the saga of how that document came to be. FG Aledo contends that Kim Gill—the president of KTFW Investments, Inc., FG Aledo's sole manager—never signed the Contract or authorized anyone else to sign it on his behalf. Riverside counters that a signature stamp bearing Gill's name was routinely used throughout the parties' dealings and that whoever stamped it had full authority to bind FG Aledo.

¶ 5.   That dispute, alongside several others, takes up hundreds of pages of briefing and evidence. There is no need, however, to untangle those factual knots today.

¶ 6.   For purposes of this Motion, the Court assumes—without deciding— that Riverside could prove the Morningstar Contract was validly executed. Even with that assumption in place, Riverside's claims cannot survive if the contract itself

fails the statute of frauds. That question does not turn on who signed the document, but on whether the contract sufficiently identifies the property that FG Aledo supposedly agreed to convey.

¶ 7.    It does not. The contract promises Riverside 181 lots somewhere within Morningstar 1-1, but never identifies which 181 lots. Before Riverside could pick a single lot, the contract required D.R. Horton—the subdivision's "Other Builder"— to first divide the development into two distinct pools. The contract provided no objective criteria for making this initial division. D.R. Horton was thus free to split the subdivision however it wished. Until D.R. Horton exercised that discretion, there were no defined groups from which Riverside could choose—and no way for Riverside, FG Aledo, or a court to determine which lots Riverside was entitled to buy. The missing terms were not merely left unwritten; they did not exist. And a contract that cannot identify the land to be conveyed, on the day it is signed, fails the statute of frauds.

¶ 8.    This conclusion is dispositive. The Court therefore does not address whether Gill authorized the contract, whether the parties mutually assented, whether the agreement is illusory, or whether Riverside would otherwise be entitled to specific performance.

## BACKGROUND FACTS

¶ 9.　The facts relevant to the statute-of-frauds analysis are largely undisputed.

¶ 10.　FG Aledo owned and was developing approximately 358 residential lots in Morningstar Section 1-1.[1] Rather than building and selling homes itself, FG Aledo's business model was to develop the land and sell the developed lots to commercial homebuilders.

¶ 11.　FG Aledo's ownership is split evenly down the middle. KTFW Investments, Inc.—owned and managed by Kim Gill—holds a 50% interest and serves as FG Aledo's sole manager. Tim Fleet holds the other 50%.[2] Fleet also owns and controls Riverside, the plaintiff in this case.[3]

¶ 12.　Prior to the events giving rise to this suit, FG Aledo had already contracted to sell roughly half of Morningstar 1-1—about 179 of the 358 lots—to homebuilder D.R. Horton under a separate agreement not at issue here.[4]

¶ 13.　Riverside claims it struck a similar deal for the remaining builder position in the subdivision. The resulting document—the "Morningstar Contract," dated October 1, 2024—purports to grant Riverside the right to purchase 181 lots.[5]

---

[1] FG Aledo MSJ Ex. 1 ("Gill Decl.") ¶¶ 6-7.
[2] *Id.* ¶ 3.
[3] *Id.* ¶ 4.
[4] *Id.* ¶ 17; FG Aledo MSJ Ex. E (DRHI Contract).
[5] Gill Decl. ¶ 8; FG Aledo MSJ Ex. A ("Morningstar Contract") § 1.01(a).

¶ 14. Unlike a conventional real-estate contract, the Morningstar Contract does not identify the 181 lots by lot and block, metes and bounds, or recorded plat (because no plat existed at the time). Instead, it identifies only the overarching 71.964-acre tract[6] and outlines a mechanism for splitting up the lots within that tract at some later date.

¶ 15. Section 1.01(c) establishes that process. It mandates that before Riverside can make a selection, the "Other Builder"—D.R. Horton—must first divide all lots in Morningstar 1-1 into two equal groups.[7] Riverside then gets fifteen days to pick one group, which becomes the "1-1 Lots" under the contract.[8] Crucially, the contract gives D.R. Horton unfettered discretion in making that initial division. The split could run north to south, east to west, in alternating rows, or any other layout. Until D.R. Horton acted, there were simply no groups for Riverside to pick

---

[6] Morningstar Contract § 1.01 & Ex. A attached thereto.

[7] Section 1.01(b) of the Morningstar Contract defines the "Other Builder" oddly. It recites that "[c]urrently, the Other Builder is Riverside Homebuilders, Ltd."—the same entity the contract calls the "Purchaser"— while also acknowledging elsewhere in section 1.01(b) that the "Other Builder" will be the entity acquiring "the Other Lots," meaning those lots *not* sold to Riverside. This conflict and circularity was pressed by FG Aledo's counsel at the summary judgment hearing. *See* FG Aledo MSJ at 23 ("The language appears to have copy/paste errors and circular references. . . ."). But the summary-judgment record leaves no genuine dispute that D.R. Horton was understood to be the Other Builder and was expected to perform the Section 1.01(c) division. FG Aledo had already contracted to sell roughly half of Morningstar 1-1 to D.R. Horton before the Morningstar Contract was signed, *see* Mem. Op. & Order ¶ 12, and at the summary-judgment hearing both sides—and the Court—proceeded on the shared understanding that D.R. Horton, as the subdivision's other builder, would divide the lots and that Riverside would then choose between the resulting groups. *See* MSJ Hr'g Tr. 16:11–17:5 (colloquy confirming that "[D.R.] Horton gets to divide the 358" and Riverside "would just get to pick once it's divided"); *id.* at 22:21–23:24; *id.* at 25:17–18 (Riverside's counsel acknowledging that D.R. Horton would divide the lots and Riverside would pick the lots). The Court accordingly treats D.R. Horton as the Other Builder for purposes of this Motion, notwithstanding the contract's imprecise drafting.

[8] Morningstar Contract § 1.01(c).

between. In short, when the Morningstar Contract was signed, Riverside's 181 lots did not exist as an identifiable set because the universe from which Riverside was to choose had not yet been created.

¶ 16.   Section 1.01(d) confirms this gap in the parties' own words. It explicitly acknowledges an "insufficiency of the legal description" and states that the parties would "obtain the legal description of the Lots pursuant to a Final Plat to be recorded at a later date."[9] No plat existed when the contract was signed; it was recorded roughly four months later, on January 30, 2025.[10]

¶ 17.   After FG Aledo refused to convey the lots Riverside claimed were ultimately allocated to it, Riverside sued for breach of contract and related claims.[11] FG Aledo now seeks summary judgment on multiple grounds, chief among them that the contract violates the statute of frauds because it fails to identify the land with reasonable certainty.

## LEGAL STANDARD

¶ 18.   Summary judgment is governed by Texas Rule of Civil Procedure 166a. A movant "bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[12] The nature of that burden varies

---

[9] *Id.* § 1.01(d).
[10] Gill Decl. ¶ 6.
[11] Pl.'s 1st Am. Pet. ¶¶ 22–32.
[12] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)).

by posture. A plaintiff must conclusively establish all essential elements of its claim.[13] A defendant must either conclusively negate at least one element of the plaintiff's claim or prove all elements of an affirmative defense.[14]

¶ 19.  In deciding whether a fact issue exists, a court takes as true all evidence favorable to the nonmovant, indulges every reasonable inference in the nonmovant's favor, and resolves any doubts against the movant.[15] The court may not weigh the evidence or resolve credibility determinations at this stage; its role is limited to deciding whether a genuine fact issue exists for trial.[16]

¶ 20. Questions of contract interpretation are especially well suited for summary judgment.[17] In construing a contract, the Court's objective is to ascertain and give effect to the parties' intent as expressed in the agreement itself.[18] To do so, the Court considers the contract as a whole, harmonizing and giving effect to all provisions so that none are rendered meaningless.[19]

---

[13] *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam).

[14] *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016).

[15] *ConocoPhillips*, 547 S.W.3d at 865.

[16] *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 422–23 (Tex. 2000); *see also Ortega v. Pean*, No. 01-18-00249-CV, 2019 WL 1560859, at *10 (Tex. App.—Houston [1st Dist.] Apr. 11, 2019, pet. denied) (mem. op.) ("[I]f a summary judgment motion involves the credibility of affiants, or the weight to be given to evidence, the motion should not be granted." (internal quotation marks omitted)).

[17] *See Hallmark v. Port/Cooper-T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex. App.—Corpus Christi-Edinburg 1995, no writ); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[18] *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

[19] *Italian Cowboy*, 341 S.W.3d at 333.

¶ 21.   This analysis begins—and, where the language permits, ends—with the contract's plain text.[20] If the language is susceptible to a definite or certain legal interpretation, it is unambiguous and must be enforced as written.[21]

**ANALYSIS**

## A.    Texas law requires the writing itself to furnish the means of identifying the property.

¶ 22.   Under the statute of frauds, a contract for the sale of real property must be in writing and signed by the party to be charged.[22] To satisfy this rule, the writing must furnish—within its four corners or by reference to another existing writing— the means or data by which the specific land to be conveyed can be identified with reasonable certainty.[23]

¶ 23.   This rule allows some flexibility. A contract need not contain a flawless metes-and-bounds description,[24] nor must it pinpoint the property without any help from outside evidence.[25] As long as the contract provides a sufficient "nucleus of description," extrinsic evidence can be used to explain those descriptive terms and trace them to the ground.[26] But there is a fundamental difference between explaining

---

[20] *Id.* (citing *Progressive Cnty Mut. Ins. Co. v. Kelley,* 284 S.W.3d 805, 807 (Tex. 2009) (per curiam)).

[21] *J.M. Davidson*, 128 S.W.3d at 229; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

[22] TEX. BUS. & COM. CODE § 26.01(a), (b)(4).

[23] *Wilson v. Fisher*, 188 S.W.2d 150, 152 (Tex. 1945); *Morrow v. Shotwell*, 477 S.W.2d 538, 539–40 (Tex. 1972).

[24] *Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996) (per curiam) (citing *Morrow*, 477 S.W.2d at 539).

[25] *See Morrow*, 477 S.W.2d at 539 ("To be sufficient, the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty.").

[26] *Dayston, LLC v. Brooke*, 630 S.W.3d 220, 225 (Tex. App.—Eastland 2020, no pet.).

a description and creating one from scratch. Extrinsic evidence can help locate land based on descriptive data already present in the writing, but it cannot supply descriptive data that the contract omits.[27] As the Texas Supreme Court explained in *Morrow*, parol evidence may add detail to an existing "framework or skeleton," but it cannot construct the framework itself.[28]

¶ 24. This core principle has held steady for decades.

¶ 25. *Wilson v. Fisher* laid the foundation.[29] Addressing a contract for the sale of land, the Supreme Court stressed that "no part of the instrument is more essential than that which identifies the subject matter of the agreement."[30] The Court held that "the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty."[31] The Court cautioned that while extrinsic evidence can be used to clarify a property's description, it cannot supply a description that the contract lacks.[32]

¶ 26. *Morrow v. Shotwell* reinforced the bright-line rule, even in a sympathetic setting.[33] There, the Supreme Court had "little doubt that the parties

---

[27] *Long Trs. v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (per curiam); *see Tex. Builders*, 928 S.W.2d at 481 ("Parol evidence may be used to explain or clarify the written agreement, but not to supply the essential terms.").

[28] *Morrow*, 477 S.W.2d at 541 (quoting *Wilson*, 188 S.W.2d at 152).

[29] *Wilson*, 188 S.W.2d at 151–52.

[30] *Id*. at 152.

[31] *Id*.

[32] *Id*.

[33] *Morrow*, 477 S.W.2d at 541.

knew and understood what property was intended to be conveyed," noting that a surveyor successfully located and platted the property using an abstract search and instructions from the parties.[34] The Court nevertheless held the contract unenforceable because neither the parties' subjective understanding nor a later-created plat could supply the description the writing lacked.[35]

¶ 27.  *Williams v. Ellison* applied the same principle to an option contract.[36] The agreement at issue allowed a buyer to select a parcel subject to only two constraints: it had to adjoin a tract already sold and avoid a water well. The buyer eventually surveyed and selected a parcel, but countless ten-acre tracts could have satisfied the two stated criteria. Because the writing provided no objective means to determine which specific tract was intended, the Supreme Court held the agreement unenforceable.[37]

¶ 28.  Finally, *Stekoll Petroleum Co. v. Hamilton* highlighted the distinction most important here.[38] The Supreme Court held that a contract allowing a buyer to select a smaller parcel out of a larger, well-described tract can satisfy the statute of frauds *if* the buyer possesses an "*unqualified* right" to make the selection.[39] But that right must be truly self-executing, requiring no further agreement, approval, or

---

[34] *Id.* at 540.
[35] *Id.* at 540–41.
[36] *Williams v. Ellison*, 493 S.W.2d 734, 736–38 (Tex. 1973).
[37] *Id.* at 737–38.
[38] *Stekoll Petroleum Co. v. Hamilton*, 255 S.W.2d 187, 191–92 (Tex. 1953).
[39] *See id.* at 191.

discretionary decision by anyone else. The contract in *Stekoll* failed that test because the buyer's selection depended on an "equitable checkerboarding" of the remaining acreage, a subjective standard requiring future choices not fixed by the contract itself.[40] Because the buyer's right was conditional rather than unqualified, the land could not be identified from the writing alone.

¶ 29.  Though these cases present varied facts, they distill down to a common principle. The statute of frauds does not demand a perfect metes-and-bounds description, nor does it forbid agreements that allow a buyer to choose a parcel from a larger tract. But the written contract must adequately describe the larger tract *and* give the buyer an unqualified right to make the selection—a right that depends on no further agreements, approvals, or discretionary choices by other persons.

¶ 30.  This is where the Morningstar Contract breaks down.

**B.     Riverside's characterization of the Morningstar Contract.**

¶ 31.  Riverside attempts to frame the Morningstar Contract as a garden-variety selection agreement permitted under *Stekoll*. In Riverside's view, the contract clearly defines the larger tract—Morningstar Section 1-1—and grants Riverside the unqualified right to pick 181 lots from within it.[41]

---

[40] *See id.* at 191–92.
[41] Pl.'s Resp. 27–29.

¶ 32. If that were actually how the contract worked, Riverside's argument would carry significant weight. *Stekoll* does indeed recognize that future-selection contracts satisfy the statute of frauds so long as they grant the buyer an absolute, unqualified selection right.[42]

¶ 33. But that is not how this contract operates. Riverside was never given an unqualified right to pick 181 lots from an established pool. Before it could pick anything, D.R. Horton first had to exercise its own discretion to divide the development into two groups.[43] Riverside's selection right arose only after D.R. Horton made its move, and extended only to whichever two groups D.R. Horton decided to create. A selection right that hinges entirely on a third party's future, discretionary decision is not an unqualified right.

## C. The Morningstar Contract provides no objective, self-executing mechanism to identify Riverside's 181 lots.

¶ 34. Section 1.01(c) underscores the core problem. Instead of identifying Riverside's lots, it sets up a contingent, multi-step process. At some unspecified point in the future, D.R. Horton was supposed to divide Morningstar 1-1 into two groups—without any contractually mandated formula governing the split. One division might run north to south; another might split the property east to west; a

---

[42] *Stekoll*, 255 S.W.2d at 191–92; *see also Martin v. Skelton*, 567 S.W.2d 585, 588 (Tex. App.—Fort Worth 1978, writ ref'd n.r.e.) (acknowledging "unqualified right" test); *Ford Dev. Corp. v. Town & Country Dev. at Stonebriar, Inc.*, No. 05-98-01561-CV, 2001 WL 399304, at *4 (Tex. App. Apr.—Dallas 20, 2001, pet. denied) (same).

[43] Morningstar Contract § 1.01(c); MSJ Hr'g Tr. 16:4–17:5, 22:13–25:20, 29:17–30:22.

third might checkerboard the blocks or divide the land into quadrants. Each scenario creates fundamentally different sets of lots. Only after D.R. Horton chose among those possibilities would Riverside's selection right arise. Only then could Riverside select a group. And only then would a new Exhibit A-1 be created to identify the lots.

¶ 35.  None of those events had occurred when the Contract was signed. D.R. Horton had not divided the subdivision. No two groups existed. Riverside had selected nothing. No Exhibit A-1 had been prepared. And no written instrument identified the lots FG Aledo was supposedly bound to convey. Until D.R. Horton acted, Riverside's 181 lots were not merely unidentified—they were completely unknowable.

**D.   Section 1.01(d) confirms the parties knew the legal description was not complete.**

¶ 36.  While Section 1.01(c) demonstrates that the property description was incomplete, Section 1.01(d) shows the parties knew it. That provision states:

> Notwithstanding any insufficiency of the legal description of the Lots, the Parties desire to proceed to create this Contract and obtain the legal description of the Lots pursuant to a Final Plat to be recorded at a later date.[44]

¶ 37. This is a telltale admission. Rather than representing that the Morningstar Contract contained an adequate property description, the parties

---

[44] Morningstar Contract § 1.01(d).

openly acknowledged its insufficiency and agreed to supply the missing description later through a plat that did not yet exist.

¶ 38.  Riverside urges the Court to view the future final plat as just another procedural step in the agreed selection process. But Section 1.01(d) says more than that. It does not promise that the final plat will clarify or confirm an already sufficient description. It states the parties will "obtain" the legal description through the future plat. Ordinarily, parties do not need to obtain something they already possess. The clause plainly reflects their shared understanding that the contract lacked a legally sufficient description of the land.

¶ 39.  Texas law does not permit parties to postpone compliance with the statute of frauds. The contract, *when made*, must furnish the data necessary to identify the land with reasonable certainty.[45] An agreement cannot bypass that requirement by acknowledging its own deficiency and promising to fix it later. If that were permissible, parties could sign blank real estate contracts and simply wait for a future survey, plat, or supplemental agreement to cure the defect. *Wilson* and *Morrow* explicitly reject that workaround. Later evidence can be used to apply an existing description to the ground, but later-created documents cannot supply the descriptive nucleus the original writing lacks.[46]

---

[45] *See Morrow*, 477 S.W.2d at 541.
[46] *Wilson*, 188 S.W.2d at 151–52; *Morrow*, 477 S.W.2d at 541.

**E. Because the contract is unenforceable, Riverside's contract claims fail as a matter of law.**

¶ 40. Every affirmative claim Riverside brings in this case depends on an enforceable contract obligating FG Aledo to convey identifiable real estate. Because the Morningstar Contract fails the statute of frauds, Riverside cannot enforce that obligation, recover for breach of contract, or obtain specific performance.

¶ 41. FG Aledo, on the other hand, seeks a specific declaration that the Morningstar Contract is unenforceable. Because the contract fails to satisfy the statute of frauds, FG Aledo is entitled to that declaration.

**F. Riverside's motion to strike is moot.**

¶ 42. Riverside separately moved to strike Gill's declaration in its entirety. It argues that statements in paragraphs 12, 17, and 19—concerning lot pricing and the use of Gill's signature stamp on other contracts—conflict with Gill's contemporaneous communications and render his declaration untrustworthy. Those disputes bear on execution, authorization, assent, and course of dealing—the very issues the Court does not reach.

¶ 43. The Court's statute-of-frauds ruling does not depend on Gill's account of those events. The ruling rests on the contract's language, not the evidence concerning its execution. Because the Court neither relies on the challenged testimony nor resolves the credibility disputes surrounding it, Riverside's objections to and motion to strike Gill's declaration are **DENIED AS MOOT**.

## CONCLUSION

¶ 44. The statute of frauds does not demand perfection in drafting. It does, however, require that a contract for the sale of real property identify the land to be conveyed—or furnish objective means by which it can be identified—with reasonable certainty at the time the contract is made.

¶ 45. The Morningstar Contract does not meet that requirement. Riverside's lots could not be identified until D.R. Horton first exercised its discretion to create the two groups from which Riverside would choose, and Section 1.01(d) expressly acknowledged that the legal description remained insufficient and would be obtained later. Those provisions did not furnish a presently operative means of identifying the property; they postponed its identification to future events.

¶ 46. FG Aledo's Traditional Motion for Summary Judgment is therefore **GRANTED** on the ground that the Morningstar Contract fails to satisfy the statute of frauds. The Court does not reach FG Aledo's remaining grounds.

IT IS THEREFORE DECLARED that the Morningstar Contract is unenforceable as a matter of law.

IT IS SO ORDERED.

_____
BRIAN STAGNER
Judge, Texas Business Court,
Eighth Division

DATED: July 29, 2026